# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Ruben Hinojosa

## DEFENDANTS

Allstate Texas Lloyds

**(b)** County of Residence of First Listed Plaintiff    **Hidalgo County, Texas**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    **Cook County, IL**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Danny Ray Scott
Scott Law Offices, P.C.
708 Main Street
Houston, Texas 77002
(713) 941-9309

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government<br>Plaintiff | ☐ 3 | Federal Question<br>*(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government<br>Defendant | ☒ 4 | Diversity<br>*(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure<br>of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original<br>Proceeding | ☐ 2 Removed from<br>State Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated or<br>Reopened | ☐ 5 Transferred from<br>Another District<br>*(specify)* | ☐ 6 Multidistrict<br>Litigation -<br>Transfer |
| | | | | | ☐ 8 Multidistrict<br>Litigation -<br>Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
**28 U.S.C. § 1332(a)(1)**

Brief description of cause:
**Property Insurance Claim Dispute**

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE

**November 1, 2021**

SIGNATURE OF ATTORNEY OF RECORD

*Danny R. Scott, Jr.*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# In the United States District Court
## for the Southern District of Texas
## McAllen Division

| | | |
|---|---|---|
| Ruben Hinojosa, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 7:21-cv-419 |
| | § | |
| v. | § | |
| | § | |
| Allstate Texas Lloyds, | § | |
| | § | |
| Defendant. | § | |

## Plaintiff's Original Complaint

### Parties

1. Plaintiff, Ruben Hinojosa, is an individual and a citizen of the State of Texas.

2. Defendant, Allstate Texas Lloyds, is a corporation that is incorporated under the laws of the State of Illinois. Defendant has its principal place of business in the state of Illinois. Defendant ay be served with process by serving its registered agent, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

### Jurisdiction

3. The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because plaintiff and defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

## VENUE

4.     Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

### D. CONDITIONS PRECEDENT

5.     All conditions precedent has been performed or have occurred.

## FACTS

6.     Plaintiff is the owner of homeowner insurance policy number 000836419695, which was issued by Allstate (hereinafter referred to as the "policy").

7.     Plaintiff owns the insured property that is specifically located at 3402 Santa Oliva Street, Mission, Texas 78572 (hereinafter referred to as the "property").

8.     Defendant or its agent sold the policy insuring the property to plaintiff.

9.     On or about July 25, 2020, plaintiff's property sustained windstorm damage. Plaintiff submitted a claim to Allstate against the policy for the damage.

10.     Plaintiff submitted a claim to Allstate against the policy for damage caused to the property because of the wind.  The insured asked Allstate to cover the cost of repairs to the property pursuant to the policy and any other available coverages under the policy. Allstate assigned claim number 0594050775 to the insured's claim.

11.     On or about August 3, 2020, Phillip G. Hicks ("Hicks"), on behalf of Allstate, inspected the property in question.  The storm caused significant damage to the roof of the dwelling and the pool house, including pitting, tearing and loss of granules to the

shingles. Wind damage uplifted and removed shingles, which would not allow the shingles to reseal to prevent water intrusion.

12. Hicks' unreasonable investigation of the claim included a failure to comply with Allstate's policies and procedures concerning roof inspections and when to replace or repair a roof. The roof required full replacement under Allstate's policies and procedures including repairs to the roof jack, drip edge, and other structural parts of the roof. Hicks performed an unreasonable investigation by failing to document all the damage to the roof. Hicks did not conduct a thorough roof inspection and did not allow the cost to remove and replace the roof. As a result of Hicks' unreasonable and brief investigation, the insured was wrongly denied the full cost to replace the roof.

13. The storm additionally caused extensive damage to the exterior of the property. Specifically, it caused damage to the fencing and an exterior light fixture. Hicks did not conduct a thorough exterior inspection and failed to allocate any cost to the repair of these exterior items. As a result of Hicks' unreasonable exterior investigation, the insured was wrongly denied the full cost to repair all the exterior damage.

14. Hicks performed an insufficient and unreasonable interior investigation of the property. Water intrusion from the roof caused extensive damage to the walls, insulation, and ceilings of the office and pool house. The extensive damage to the interior of the property called for the drywalls to be sealed, hung, taped, and floated, removal and replacement of insulation, repair to the texture, painting, and content removal. Hicks did

not conduct a thorough interior inspection and did not make sufficient allowances for interior damages. As a result of Hicks' unreasonable investigation, the insured was wrongly denied the full cost to repair all the interior damage.

15. Hicks failed to document the damage to the roof. As a result, Hicks missed significant interior damages to the insured's home. Hicks conducted an insufficient inspection and prematurely closed the insured's claim. At the time of the investigation, premature closing of claims was part of a pattern and practice of claims handling by Allstate.

16. Allstate failed to properly adjust the claim and Allstate has denied at least a portion of the claim without an adequate investigation, even though the policy provided coverage for losses such as those suffered by the insured. Furthermore, Allstate underpaid portions of the insured's claims by not providing full coverage for the damages sustained by the insured, as well as under-scoping the damages during its investigation.

17. Allstate failed to properly qualify, train, and supervise its employees and agents to whom Allstate entrusted the handling of various portions of insured's claim. Allstate, its agents, and employees failed to follow procedures and properly execute their duties as promulgated in Allstate's system of administering and handling the insured's claim. Allstate's actions, as detailed in the facts of this letter and the allegations set forth below, caused a system failure that resulted in Allstate's violation of the Texas Insurance Code,

Texas Deceptive Trade Practices Act, as well as the violation of a host of Texas common law principles of law. These violations resulted in Allstate's denial to the insured of the full protection and benefits of these laws and the policy benefits to which the insured was entitled.

18.    To date, Allstate continues to delay in the payment for the damages to the property. As such, the insureds' claim(s) remain unpaid, and the insured still has not been able to properly repair the property.

## THE CASUALTY INSURANCE SYSTEM

19.    The casualty insurance industry is one in which policyholders are forced to buy an unseen, but socially essential, financial product "on faith" from insurers who market their product with promises of prompt and full protection.[1] The indemnity principle of insurance expresses the casualty insurer's traditional duty to provide full restitution of covered casualty losses in order to preserve its insureds' standard of living.[2] Under the fiduciary principle, "an insurance company holds funds of its insureds (the payment of premiums) in trust, and through an 'insuring agreement' promises to make *all benefit payments for which it has received premiums.*"[3]

## THE ROLE OF INSURANCE UNDERWRITING

---

[1] David Berardinelli, J.D., Michael Freemen, Ph.D., D.C., M.P.H., and Aaron C. DeShaw, *From Good Hands to Boxing Gloves: How Allstate Changed Casualty Insurance in America*, at p. 42 (2nd ed. Trial Guides, LLC, 2008).
[2] *See* Rubin, Harvey W., DICTIONARY OF INSURANCE TERMS, at 218, (3rd ed. Barron's 1995), hereinafter referred to as "Rubin."
[3] *Id* at 167.

20.     Underwriting is the process of (1) deciding which accounts are acceptable, (2) determining the premiums to be charged and the terms and conditions of the insurance contract, and (3) monitoring those decisions.[4]  Underwriting is what insurers do to be financially successful.[5]  Although insurers include other specialty departments such as actuarial, claims, and marketing, all insurer activities follow from corporate underwriting decisions.[6]  The purpose of underwriting is to ensure that the risk transfer is equitable and the insurer is able to develop and maintain a growing, profitable book of business.[7]

21.     The law of large numbers helps insurers to predict the number of losses they will pay in any given time period so that they can determine what premium is required to pay those losses.[8]  The law of large numbers enables insurers to offer large dollar amounts of coverage for much less money in return.[9]  Insurers underwrite a large number of similar risks and predict the dollar amount of all the losses that those insureds are expected to experience.[10]  Premiums are based on each insured's share of the predicted losses plus the insurer's expenses and an allowance for profit.[11]

---

[4] Joseph F. Mangan, CPCU and Connor M. Harrison, CPCU, AU, *Underwriting Principles* at p. 1 (2nd ed. The Institutes 2010), hereinafter referred to as "Mangan."
[5] *Id*.
[6] *Id*.
[7] *Id*. at 2. ("Book of Business" is insurance industry terminology that refers to the collection of all the policies written by an insurer.  Although the term can have various meanings, this text will use it to refer to all of an insurer's policies).
[8] James Markham, Kevin M. Quinley, and Layne S. Thompson, *The Claims Environment*, at 1.2 (Malvern, Pa.: IIA, 1993), hereinafter referred to as "Markham."
[9] *Id*.
[10] *Id*.
[11] *Id*.

22. Insurance can work effectively only if underwriters accept risks that will experience no more than the types and amounts of losses anticipated in the rates.[12] If underwriters accept risks that experience more losses than anticipated, then the rates will be inadequate and the insurer's solvency might be threatened.[13] Actuaries predict the number of losses that will occur and the amount of money that insurers will pay in claims to develop rates for insurance.[14] The claim department provides the raw data, such as number of claims, claim payments, and reserve amounts, that actuaries analyze through complex mathematical methods.[15] Actuaries use this actual claims data in predicting the number of losses that will occur and the amount of money that insurers will pay in claims.[16] Insurers then use this information to set premium rates that will enable the insurers to pay the predicted amount of policyholder claims, pay the insurers' expenses, and make a reasonable profit/surplus.[17] Insurance companies could not provide this valuable service unless they were able to make a legitimate profit sufficient to allow them to remain solvent and provide a reasonable return to their shareholders/stakeholders.[18] Premiums are already calculated to allow insurers to accomplish both of those goals.[19]

---

[12] *Id* at 1.13.
[13] *Id*.
[14] *Id*. at 1.15.
[15] *Id*.
[16] *See* Markham, at 1.15.
[17] *Id*. at 1.2.
[18] David Berardinelli, J.D., Michael Freemen, Ph.D., D.C., M.P.H., and Aaron C. DeShaw, *From Good Hands to Boxing Gloves: How Allstate Changed Casualty Insurance in America*, at p. 36 (2nd ed. Trial Guides, LLC, 2008), hereinafter referred to as "Berardinelli."
[19] *See* Markham, at 1.2.

23.     Casualty insurance is designed to pay the full cost of the property casualty losses suffered in a covered event.[20]  Under the indemnity principle, the "objective [of casualty insurance] is to restore the insured to the same financial position after the loss that he or she was in prior to the loss."[21]  When casualty insurance works properly, it achieves this socially vital objective – and our lives can proceed relatively unimpaired by the financial hardship of an unexpected casualty loss.[22]  When casualty insurance fails and leaves us in a worse financial position after a covered loss, the indemnity principle is defeated, and we all suffer the consequences.[23]

## HOW INSURANCE PREMIUMS ARE CALCULATED

24.     The primary building block of casualty premiums is called "loss costs."[24]  Loss costs are the insurer's good faith projection of how much it will pay for legitimate claims during a given policy period.  Loss costs are based on vast actuarial experience and are usually very accurate, being based on the "law of large numbers."[25]  Loss costs make up generally about seventy cents ($0.70) of every premium dollar we pay for property-casualty coverages.[26]

---

[20] *See* Berardinelli, at 7.
[21] *See* Rubin, Harvey W., DICTIONARY OF INSURANCE TERMS, at 218 (3rd ed. Barron's 1995).
[22] *See* Berardinelli, at 7.
[23] *Id*.
[24] Also called "loss trends."  *See* Rubin, at 278, Footnote 1 on page 7, *supra; Id*., at 278, 384.
[25] "In a statistical context, 'law of large numbers' implies that the average of a random sample from a large population is likely to be close to the mean of the whole population."  *See* Wikipedia Encyclopedia, http://en.wikipedia.org/wiki/Law_of_large_numbers.
[26] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.

25.    Insurers charge their policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period.[27]  Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar, with the remaining five cents ($0.05) being allocated for the insurer's profit.[28]  In addition, the insurer's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are collected and when the claims are finally paid (on average about ten cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.[29]

26.    The seventy cents ($0.70) of the policy dollar is the part of the premium fund designated to pay policyholder claims.[30]  If the insurer's promise to pay claims is the product we are buying, then the insurer's projection of loss costs is like that statement on the product label describing important details of the product to the customer.[31] Policyholders do not want to pay for more losses than the insurer is actually going to pay – just as consumers do not want to pay for more of a product than they are actually going to receive from their purchase.[32]

---

[27] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.
[28] *See* Berardinelli, at 19.
[29] *Id*.
[30] *Id* at 20.
[31] *Id*.
[32] *Id*.

27.     Policyholders expect insurers to design their "claim payment factory" to generate a product that meets the expectations created by the promises the insurers make on the label of every product it sells, i.e., ... the insurance policy.[33]  Policyholders' most important expectations are full indemnification and peace of mind – the security of knowing covered casualty losses will be restored promptly and fairly, without being forced through a lot of needless adversarial hoops.[34]  Policyholders do not expect the insurance product to be designed so that only experts, attorneys and insurance professionals can figure out how to obtain its promised benefits.[35]  Rather, policyholders expect to be able to receive the benefits of their insurance policies themselves without a lot of difficulty and delay and without professional help.[36]

**THE ROLE OF THE CLAIMS ADJUSTER**

28.     Claims are handled well when insurance companies pay what they owe, promptly and without muss or fuss.[37]  When claims departments become transformed into profit centers and the job of claims adjuster is redesigned to be a contributor to corporate profits, however, how claims departments work affects how well they work.[38]

---

[33] *Id.*
[34] See *Zilisch v. State Farm Mutual Insurance Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000).
[35] *See* Berardinelli, at 20-21.
[36] *Id.* at 21.
[37] Feinman, Jay M., *Delay, Deny, Defend: Why Insurance Companies Don't Pay Claims and What You Can Do About It*, at 86 (1st ed. Penguin Group 2010), hereinafter referred to as "Feinman."
[38] *Id.*

With a new, systematic approach to the claims process, claims departments work well for the companies but sometimes not so well for those who rely on them.[39]

29.    As late as the 1970's, most insurance adjusters exercised a great deal of discretion.[40]  The adjuster saw his job as settling claims for a fair amount.[41]  The common understanding was "we close the case out with everybody happy" by paying "what the claim is worth."[42]  Insurance companies were not in business to "chisel" the public.[43]  If the insurance company knew the claim was worth $20,000, then the insurance company paid $20,000.[44]

30.    The claims adjuster whose job demands brains, integrity, and guts is now much less in evidence, because most adjusters are more closely bound to office and computer and are subject to elaborate systems that direct their work.[45]  Today's adjuster is less an advocate for fair treatment of the consumer, because adjusters are often required to conform to the demands of the claim-processing system and are evaluated on their conformity to the system, including, explicitly or implicitly, on the amount paid out, or not paid out, in claims.[46]  The key to the claim process is the system, not the adjuster.[47]  A highly organized, industrialized system for processing claims is the key to modern

---

[39] *Id.*
[40] *Id.* at 87.
[41] *Id.*
[42] H. Laurence Ross, *Settled Out of Court: The Social Process of Insurance Claims Adjustments* (Chicago: Aldine, 1970), 46-54.
[43] *See* Feinman, at 87.
[44] *Id.*
[45] *See* Feinman, at 87.
[46] *Id.*
[47] *Id.* at 88.

insurance adjusting.[48]   The model is the shift from individual craftsman as jack-of-all-trades to specialized production in which each worker in a factory produces a single product, over and over.[49]   Because the adjuster has less discretion, he needs less training, and the training that is provided is focused on applying the system.[50]   More than a third of insurance companies provide new adjusters with two to four weeks of training, and one out of eight companies provide less than a week of training or no training at all.[51] The knowledge that is needed for processing claims is built into the system and therefore does not have to be held by the adjuster.[52]   Adjusters have become less independent and more efficient from the company's point of view, with efficiency defined in terms of following the dictates of the claims systems.[53]   The systems dictate process and results, and adjusters are evaluated on their adherence to the system.[54]   The adjuster's new role, therefore, is less to be an experienced professional making an individual evaluation of each claim and more a clerk executing the demands of the system.[55]   From the company's and the adjuster's perspective, this makes each claim much like every other claim, which generates efficient and predictable results.[56]   From the policyholder's perspective, of

---

[48] *Id.*

[49] *Id.* at 89.

[50] *Id.*

[51] R. Jones, Ira Blatt, and Thomas G. Barger, "Keeping Customers and Employees Happy: Claims Best Practices," *Claims* (October 2001), 50.

[52] *See* Feinman, at 90.

[53] James Mathis, "Efficient or Malicious," United Policyholders Website, May 2008, www.unitedpolicyholders.org/e_news/May08/article_Auto.html.

[54] *See* Feinman, at 91.

[55] *Id.*

[56] *Id.*

course, that is not the point of the insurance policy; the point of the insurance policy is prompt and fair processing of a unique loss.[57]

31.     The most widely information system in property casualty insurance adjusting is Xactimate®, which estimates the cost of repairs to damaged homes and other property.[58] Xactimate® is software for estimating the extent of a loss and the cost of repairs that presumes to be exact.[59]  A property loss adjuster takes his Xactimate®-loaded laptop and measures, records and lists information about the damaged property, and the program produces a dollar amount that will be the basis of the insurance company's payment of a claim.[60]  Xactimate® works off choices made by the adjuster, and because it needs to cover many different situations, the program is designed to give the adjuster a wide range of choices.[61]  Each of these choices affects the repair estimate.  When drywall is replaced, the new drywall needs to be painted; the adjuster must choose the appropriate application – seal/prime, seal then paint, paint one coat, or paint two coats – each of which will produce a different cost estimate.[62]  If a large area of drywall needs to be replaced, the adjuster may or may not decide the furniture and other contents need to be removed to allow for work space and to protect the contents; that can be accounted for as labor and contents manipulation, with the adjuster adding a variable for the time needed or the size of the

---

[57] *Id.*
[58] *Id.* at 92.
[59] *Id.* at 93.
[60] *Id.*
[61] *Id.* at 168.
[62] *Id.*

room as small, medium, or large.[63]  In the case at hand, the defendant manipulated Xactimate® in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

32.    If Xactimate® was actually exact, it would benefit insurance companies and policyholders alike.[64]  Unfortunately, Xactimate® permits considerable error by adjusters and each is subject to manipulation by insurance companies.[65]  Xactimate® is a tool and, like any other tool, it is neither perfect nor impervious to misuse.[66]  It first depends on an accurate scope of the work and, as with any program, the concept of "garbage in, garbage out" applies.[67]  Any errors in scope will produce an inaccurate estimate.[68]  Like other elements of the systematic approach to claims processing, Xactimate® might favor efficiency and profits at the expense of accuracy and fairness.[69]  In the case at hand, the defendant's adjusters committed considerable error in their use of Xactimate® and manipulated Xactimate® in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

33.    The adjuster's job is to honor the company's promise to pay what is owed, no more but no less.[70]  Whether and how much an adjuster pays in a particular case or all

---

[63] *Id.*
[64] *Id* at 93.
[65] *Id.*
[66] *Id.* at 167.
[67] *Id.* at 144.
[68] *Id.* at 167.
[69] *Id.* at 93.
[70] *Id.* at 94.

cases should depend only on how much the company owes on claims.[71] If the adjuster's

pay, or the adjuster's status as a third-party vendor, is tied to reducing claim payouts or

on closing cases without payment, then the insurance company has given the adjuster an

incentive to violate accepted practices and break the promise the company made to its

policyholders.[72] In the case at hand, the defendant provided positive and/or negative

incentives to its adjusters that caused defendant's adjusters to adjust the claim in a

manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

34.     When a policyholder files a claim, the fundamental truth about the claim process

should come into play: when a loss occurs that is within the coverage of the insurance

policy, the policyholder has already paid for the loss.[73] The risk has been defined, priced,

transferred from the insured to the insurance company, and shared by the company

among its policyholders and investors, so all that is legitimately left to be done is to pay

the claim.[74] From the policyholder's point of view, the covered event should now be risk

free – that is, free of the risk that the company will fail to pay what it owes.[75] The actuary's

job is to evaluate risk characteristics, the underwriter's job is to evaluate potential

insureds, and the executive's job is to manage the whole process, but the claims adjuster's

only job is to decide if a loss falls within the policy, determine the extent of the loss, and

---

[71] *Id.*
[72] *Id.* at 95.
[73] *Id.* at 25.
[74] *Id.*
[75] *Id.*

pay the claim.[76]  In the case at hand, the policyholders of which Allstate's book of business was comprised paid the full value of plaintiff's loss.  However, Allstate intentionally and strategically failed to transfer those claim trust funds to plaintiff and instead retained those funds as profit.  Allstate's wrongful actions led to the improper denial of plaintiff's claim.

INSURANCE COMPANIES' USE OF LITIGATION

35.    "When an insured buys insurance, she buys insurance – not a lot of vexatious, time-consuming, expensive litigation with her insurer."[77]  As stated previously, insurance companies account for future claim payouts, claim expenses, and a reasonable profit in setting premium rates for their books of business.[78]  However, insurance companies have hired consulting companies, such as McKinsey & Company, to implement plans, strategies, policies, and processes to transform insurance companies' claim departments into profit centers.[79]  McKinsey & Company is the most powerful consulting company in the world and has "the greatest global reach of any advisor to management in the world."[80]  It serves as the chief advisor and key architect of strategic thinking for "147 of the world's 200 largest corporations, including 80 of the top 120 financial-services firms, 9 of the 11 largest chemical companies, and 15 of the 22 biggest health-care and

---

[76] *Id.*
[77] *Hayseeds, Inc. v. State Farm Fire & Casualty*, 352 S.E.2d 73, 79 (W. Va. 1986).
[78] *See* Mangan, at 2.
[79] *See* Feinman, at 12.
[80] *See* Byrne, John, *Inside McKinsey*, BUSINESSWEEK-ONLINE, July 8, 2002, http://www.businessweek.com/magazine/content/02_27/b3790001.htm (accessed February 2006), hereinafter cited as "Byrne."

pharmaceutical concerns."[81]  McKinsey's clients pay from $10 million to $60 million per

year for advice on how to manage their business operations to increase profitability.[82]

McKinsey & Company acted as a leader in formulating a new insurance strategy to

convert insurance claim departments into efficient profit centers.  Many of the world's

largest insurers hired McKinsey for this purpose.  However, although every insurance

company did not hire McKinsey directly and did not have a direct relationship with

McKinsey, McKinsey's policies influenced the operations of the insurance industry as a

whole because of the extraordinary results McKinsey achieved for the insurance

companies that did retain McKinsey directly for its consulting services.  By 1992,

McKinsey had already worked on a number of projects for insurance companies seeking

to increase profits.  These included State Farm, Hartford, United Services Automobile

Association (USAA), and possibly Nationwide, and Liberty Mutual as well.[83]  During the

mid-1980's, USAA invited interested members of the insurance community to its home

office in San Antonio for open discussions about McKinsey's redesign of its claim

system.[84]  USAA credited McKinsey with "saving" the company and openly shared

information about McKinsey's creation of USAA's new claims handling system.[85]

---

[81] *Id*. at Footnote 5 on page 10, *supra.*
[82] *Id*.
[83] *Id*.
[84] David Berardinelli, J.D., Michael Freemen, Ph.D., D.C., M.P.H., and Aaron C. DeShaw, *From Good Hands to Boxing Gloves: How Allstate Changed Casualty Insurance in America*, at p. 36 (2nd ed. Trial Guides, LLC, 2008).
[85] *See* Affidavit of Gary T. Fye, ¶ 20, *King v. Allstate Ins. Co.*, SF 97-3008(c), filed July 28, 1999.  Gary T. Fye is a nationally known claim handling expert who has testified in a number of cases nationwide regarding Allstate's CCPR program.  Mr. Fye testified in *Campbell v. State Farm Mut. Auto. Ins. Co.*, 65 P.3d 1134, 1148 (Utah 2001). *See also* Rasiel, Ethan M., THE MCKINSEY WAY, at xi (McGraw-Hill 1999).  Mr. Raisel's book is based on his personal experiences as a McKinsey associate between 1989 and 1992. *Id.*, at xiv.

36.     In essence, the McKinsey strategy calls for insurance companies to take measures to reach various goals as part of its design to convert the insurance claims handling department into an efficient profit center.   A major goal of this strategy is to shift any advantage away from the insureds and plaintiffs' attorneys.[86]   As the first step in the process, insurers reduce attorney representation levels by improving the initial customer service experience for its insureds.   Specifically, insurers make early contact with the insureds following a claim, promises fair treatment, and promises prompt payment.[87] During the claim investigation, insurers aggressively investigate only the facts which defeat the claim once attorney representation begins.[88]   Insurers then make "firm" [take-it-or-leave-it] settlement offers with no real negotiation.[89]   If the insured refuses to accept the "firm" offer, then the insurance company aggressively litigates the claim to verdict without negotiation or compromise, employing hard-nosed tactics designed to make litigation so lengthy and expensive that policyholders and attorneys will yield to the insurer's claim values.[90]   Essentially, policyholders who want "prompt" payment – meaning they are willing to give the insurance company a cut from their share of the claim trust fund – get "Good Hands" treatment; while policyholders who want "fair" payment – meaning they refuse to give the insurance company a cut from their share of

---

[86] *See* Berardinelli, at 672 (citing "The McKinsey Slides" at 2929).
[87] *See* Berardinelli, at 90.
[88] *Id.*
[89] *Id.*
[90] *Id.*

the claim trust fund – get "Boxing Gloves" treatment.[91]  No policyholder, however, would get both prompt *and* fair payment of a claim.[92]

37.    McKinsey implemented a litigation management system designed to enforce policyholder acceptance of its new claim system.  Under traditional casualty insurance thinking, insurers were naturally disposed to avoiding litigation whenever possible, because litigation tended to defeat the goals of the fiduciary/indemnity paradigm.[93] McKinsey saw litigation as providing the best possible venue for achieving the goals of its new system for casualty insurance.[94]  Litigation is costly and time consuming. It allows an insurer to fully exploit its overwhelming financial superiority and the policyholder's vulnerability to delay, which is the natural consequence of the casualty loss.[95]  Litigation would also provide a means for McKinsey to send messages to other policyholders and plaintiff's attorneys about the futility of resistance to the new system.[96]

38.    In addition to these company-level procedures, McKinsey implemented an insurance company strategy that focused on societal, legislative, and commercial measures which all but ensured the success of the strategy.  McKinsey implemented a plan for insurance companies to lead national campaigns to attempt to change public policy, abolish or reduce the effectiveness of bad faith statutes, and judicially repeal the

---

[91] *Id.* at 95.
[92] *Id.*
[93] *Id.* at 124.
[94] *Id.*
[95] *Id.*
[96] *Id.*

common law fiduciary/indemnity paradigm which made it bad faith for casualty insurers to use increased shareholder value or increased claim surpluses as the only legitimate goals of claim handling.[97]

39. Defendant's claim handling protocols, company goals, profit goals and claim handling strategy originates from the doctrine that was created, implemented, and shared with the insurance community by McKinsey. Defendant's protocols, strategies, and procedures for handling homeowner insurance claims are closely aligned with and virtually matches the claims handling system created by McKinsey. In the case at hand, Allstate implemented a McKinsey based claim handling system to increase its profits at plaintiff's expense.

### INFORMATION LIKELY TO BE IN THE POSSESSION OF ALLSTATE

40. As with all bad faith cases, most of the proof of plaintiff's bad faith claim against Allstate will be uniquely and solely in Allstate's possession. Therefore, because the facts pled in this complaint are peculiarly within the defendant's knowledge, the facts contained in plaintiff's amended complaint are based on plaintiff's available information and belief. FED. R. CIV. P. 9(b). Such allegations have evidentiary support arising out of the facts of this case, and the plaintiff believes such allegations will have further evidentiary support after a reasonable opportunity for further discovery from Allstate.

---

[97] *See* Berardinelli, at 313-314 (citing "The McKinsey Slides," at 2929).

41. Allstate initiated a program in the mid-1990's called "Claims Core Process Redesign," or CCPR. Allstate was assisted in the implementation of CCPR by McKinsey & Company. The purpose of the CCPR program was nothing less than to transform Allstate into the most profitable claim service in the industry. The CCPR program achieved this goal by artificially reducing claim payments. CCPR was the result of a closed file survey conducted by Allstate personnel rather than independent auditors. These closed file surveys purported to identify which claims were overpaid. The closed file survey included a flaw as it did not utilize an established metric for the underpayment of claims. The true motive behind the closed file survey was to identify ways to artificially lower claim payouts in a manner detrimental to Allstate's first- and third-party claimants. In the case at hand, Allstate employed CCPR principles to its handling of plaintiff's claim in a manner that maximized shareholder profits and compromised the fair handling of plaintiff's claim.

42. Allstate ensured its employees would assist in the implementation of CCPR by creating incentive programs for claim adjusters and management to reduce average claim payouts, regardless of merit. Allstate's incentive programs were known as Quarterly Performance Reviews (QPR) or Planning, Performance, and Review (PP&R). These artificial goals had, and continue to have, no rational relationship to the actual value of any individual claim, including the plaintiff's claim in this case.

43.     One of the ways in which Allstate achieved lowered claim payments was to adopt an aggressive strategy towards wind claims.  Following wind claims, Allstate implements a policy of standard denial, which requires insurance adjusters to initially deny policyholder claims as a means of gauging the policyholder's willingness to haggle with the insurance company.  If the policyholder accepts the denial, then Allstate retains all of the money owed to the policyholder.  In essence, Allstate eliminates claims by issuing sweeping denials under the presumption that some policyholders will accept the denial without question.  Policyholders who refuse to accept the denial and choose to pursue their claim through litigation, however, face "mad dog defense tactics" that frustrate policyholders' ability to pursue their claims.  In addition, because litigating insurance bad faith claims has become so expensive and time consuming, policyholders and attorneys are becoming increasingly unwilling to fight insurance companies.  Thus, Allstate not only frustrates policyholders' attempts to pursue their claim, but Allstate also sends a message to plaintiff's attorneys that filing suit against Allstate does not constitute an economically viable option.  As a result, lawyers who routinely represent plaintiffs in first-party insurance homeowner insurance claims will refuse to represent plaintiffs who have claims against Allstate.

44.     Allstate also routinely withholds "overhead and profit" as part of its scheme to achieve lowered claim payments.  "Overhead and profit" is a benefit available to policyholders that provides an additional twenty percent above the amount of the claim

to pay for a general contractor to coordinate repairs. Insurance companies have an obligation to include overhead and profit in the actual cash value payment. Allstate conceals and fails to disclose the availability of the overhead and profit benefit to policyholders. In this case, Allstate wrongfully denied coverage for plaintiff's claim for overhead and profit.

45. Allstate also creates an environment that encourages independent adjusters to underpay claims. By tracking the average amount paid on claims for each adjuster, Allstate can determine which adjusters are keeping costs down. Allstate therefore rewards independent adjusters by giving them additional business in exchange for minimizing Allstate's indemnity payout on claims. This arrangement creates a conflict of interest between the independent adjusters and the policyholders and allows the policyholders to detrimentally rely on the independent adjusters' determinations without knowledge of the conflict of interest. In this case, Allstate assigned an inadequately trained adjuster to inspect plaintiff's property and adjust plaintiff's claim. In addition, the adjuster had an Allstate-provided financial incentive to deny all or part of plaintiff's claim.

46. Through implementation of CCPR, Allstate develops incentives, such as promotions for keeping costs down, that results in policyholders being paid less than they are owed. CCPR creates pressure for profit-making that manifests itself in underpayment of claims. Allstate had actual awareness that CCPR would result in

underpaying policyholders' claims. Allstate employs a nationwide scheme to cheat policyholders out of money to which the policyholders are entitled. Allstate has employed the principles and techniques of CCPR against plaintiff in this case in a deceptive, fraudulent, oppressive and malicious manner. In this case, Allstate provided its managers, adjusters and employees who handled plaintiff's claim with a financial incentive to deny all or part of plaintiff's claim.

47. After Allstate implemented CCPR in 1995, Allstate's surplus, or "the excess of an insurance company's assets above its legal liabilities"[98] skyrocketed from $6.5 billion in 1994 to $16.8 billion in 2004, a total increase of $10.2 billion – an average yearly increase in surplus of about $1 billion per year.[99] By comparison, between 1986 and 1994—the years immediately before CCPR was implement—Allstate's surplus increased by a *total* of $2.5 billion—for an average increase of only $272 million per year.[100] To put this further into perspective, it took Allstate sixty-three (63) years to build up its 1994 surplus of $6.5 billion.[101] After implementing CCPR, Allstate nearly tripled its surplus in only ten (10) years. Allstate's stockholder dividends have steadily risen every year since CCPR was implemented, almost tripling from thirty-nine cents ($0.39) per share in 1995 to one dollar

---

[98] *See* Rubin, at 359, Footnote 1 on page 7, *supra.*
[99] *See* Best's Key Rating Guide, 1999, 2003, 2005. *See* Best's Key Rating Guide, 1999, Ed., at 22; Best's Key Rating Guide, 2003 Ed., at 26; Best's Key Rating Guide, 2005 Ed., at 30.
[100] *See* Best's Key Rating Guide, 1991 Ed., at 20; Best's Key Rating Guide, 1995 Ed., at 24. The precise increase was $2,449,958,000, for an average yearly increase of $272,217,000. *Id.*
[101] Allstate started building its surplus in 1931. <u>See</u> *Zilisch v. State Farm Mutual Insurance Auto. Ins. Co.*, 995 P.2d 276 at 280.

and twelve cents ($1.12) per share in 2004.[102]  Remarkably, these increases in surplus also occurred despite an unprecedented string of natural disasters, including numerous devastating hurricanes in the Southeast and a major California earthquake.  These increases are more remarkable because they also occurred after the payment of dividends to Allstate shareholders amounting to approximately $18 billion since 1996, according to financial presentations made by Allstate senior executives to the investment community in 2006.[103]

48.    Another component of CCPR focused on the rate at which claimants were represented by legal counsel.[104]  Allstate's CCPR manual directed claim representatives to "realize that the way we approach claimants and develop relationships will significantly alter representation rates and contribute to lower severities."[105]  The manual explained that "payment on represented claims is on average five times the size of unrepresented claims."[106]  Consequently, Allstate instructed its claim personnel to eliminate or reduce the likelihood that a claimant would hire an attorney.[107]

49.    By dissuading claimants from seeking legal counsel, Allstate was able to prey upon unrepresented claimants' trust and lack of knowledge and to deny or settle claims

---

[102] *See* May 17, 2005, Report Annual Meeting of Shareholders, at 7-8, www.allstate.com/investor/annual_report/2004/financial.asp.
[103] *See* ArgusVision 2007 presentation, Robert Block, Allstate V.P. Investor Relations, November 13, 2006, http://ir.allstate.com/phoenix.zhtml?c=93125&p=irol-irhome.  *See also* Allstate Corporation Annual Reports 2001-2005 at p. 4 in each report, http://www.allstate.com/investor/proxy/stat_statements.asp.
[104] *See* Berardinelli, at 687, 692 (citing "The McKinsey Slides," at 3372, 5166).
[105] *Id.*
[106] *See* Berardinelli, at 715 (citing "The McKinsey Slides," at 12504).
[107] *See* Berardinelli, at 662, 675, (citing "The McKinsey Slides," at 10, 2932).

for a fraction of their value.[108]  If a settlement offer was not accepted or the claimant hired an attorney, Allstate would fully litigate virtually every claim, irrespective of the value of the injuries suffered by the claimant.[109]  Allstate thereby sought to subject claimants to unnecessary and oppressive litigation and expenses, or in other words, "scorched-earth litigation tactics."[110]  In the case at hand, Allstate wrongfully denied all or a portion of plaintiff's claim with the expectation that plaintiff would not hire an attorney.

50.    Allstate instructed its claim representatives to meet with the claimants' attorneys to emphasize those costs" *i.e.*, "attorney economics" – through threats, intimidation, and strong-arm tactics.[111]  Allstate carried out its policies through the active participation of its attorneys.  The "Litigation Management" section of the CCPR manual segmented, or targeted, certain claims for litigation and trial.[112]  One such litigation segment was referred to as "Settle for 'X' or less – default to trial."[113]  Allstate's attorneys were required to "increase trial activity in appropriate cases," such as "where settlement could not be reached for the evaluated amount."[114]  The reason that Allstate's attorneys were expected to have "more trials" was to "reduce loss payout."[115]  Allstate used incentive

---

[108] *Young v. Allstate*, 119 Haw. 403, 407 (Haw. 2008).
[109] *Id.*
[110] *Id.*
[111] *Id.* at 407-408.
[112] *Id.* at 408.  *See* Berardinelli, at 693 (citing "The McKinsey Slides," at 5379).
[113] *Young v. Allstate*, 119 Haw. at 408.
[114] *Young v. Allstate*, 119 Haw. at 408.
[115] *Id.*; *See* Berardinelli, at 715 (citing "The McKinsey Slides," at 3010, 4964, 5166, 5400, 5403 …) (There are approximately 13,000 McKinsey Slides in total.  These slides are summarized in the referenced *Berardinelli* publication.  The total number of slides that support this footnote are too numerous to list.).  This information is in the public domain and is accessible to anyone in the world who wants to view the information.

compensation programs to encourage its attorneys to try more cases, irrespective of whether such litigation was justified by the facts.[116]  In the case at hand, Allstate denied plaintiff's claim as part of its scheme to use litigation costs and "attorney economics" to dissuade plaintiff and any attorney plaintiff would hire from challenging Allstate's claim decision.

51.    Any resulting decrease in claim payments did not serve as a reflection of the true value of the defended claims.  Allstate's research indicated that claimants' attorneys who brought cases to trial obtained favorable results.[117]  Allstate determined, expressly and as a matter of corporate claims handling policy, that litigating claims "appear to lead to better results than negotiating with plaintiff attorneys."[118]   Nevertheless, because of Allstate's scorched-earth litigation tactics and the message Allstate sends to attorneys regarding Allstate's proactive claim defense stance, Allstate correctly predicted that substantially fewer claimant attorneys would bring those insureds' claims to trial.[119] Hence, Allstate would receive a net decrease in claim payouts.

52.    Allstate applied the claim handling principles of CCPR across all insurance coverage lines.  Specifically, Allstate specifically implemented a version of CCPR to govern its handling of homeowner insurance claims.[120]

---

[116] *Id*; *See* Berardinelli, at 707 (citing "The McKinsey Slides," at 9637).
[117] *See* Berardinelli, at 682 (citing "The McKinsey Slides," at 3010).
[118] *Id*.
[119] *See* Berardinelli, at 676, 693 (citing "The McKinsey Slides," at 2939, 5379).
[120] *See* Berardinelli, at 462, 467, 711 (citing "The McKinsey Slides" 7696, 7785, 9871).

53.     Allstate handled plaintiff's claim under the construct, policies, procedures, and goals of the CCPR program created by McKinsey & Company and implemented by Allstate.

**ALLSTATE'S CLOSED FILE SURVEY**

54.     Prior to Allstate's implementation of Homeowner CCPR, McKinsey & Company conducted a preliminary "Closed File Survey" of eleven (11) Market Claims Offices ("MCO's").[121]  Before initiating the survey, McKinsey began with the presumption that Allstate's claim process exhibited "leakage," or the overpayment of policyholder claims.[122]  It is worth noting that the McKinsey slides provide no proof or support for this critical assumption.   Subsequently, Allstate's senior executives became somewhat uncomfortable with McKinsey's term "leakage," and began to substitute the oxymoronic phrase "fair value" or "fair payment."[123]

55.     McKinsey then segmented claims into homogenous groups based on type of coverage, type of damage, and attorney involvement.[124]   Using this segmentation procedure to organize the claim processes that would make up the homeowner portion of CCPR, McKinsey classified claims into groups based on common characteristics, which presented the best opportunity for reducing claim payments.  McKinsey determined that

---

[121] *See* Berardinelli, at 82 (citing "The McKinsey Slides" at 33); MCO is Allstate's acronym for "Market Claims Office," the office which handles all the Allstate claims for a particular geographical area.
[122] *See* Berardinelli, at 61 (citing "The McKinsey Slides" at 15).
[123] *See* Berardinelli, at 61 (citing "The McKinsey Slides" at 2991).
[124] *See* Berardinelli, at 665 (citing "The McKinsey Slides" at 30).

the evaluation of wind and fire claims presented the largest opportunity for reduced claim payouts.[125] McKinsey's closed file survey indicated that "overpayments" occurred in the adjustment of claims when adjusters evaluated claims based on their professional claim experience according to the individual merits of each claim.[126]

56. While building CCPR, Allstate and McKinsey started with profit goals and then built a claim evaluation system aimed at achieving those goals. Specifically, McKinsey built Allstate's claim evaluation system around Colossus.[127] Colossus allowed Allstate to calibrate or "tune" the software program by inputting predetermined claim values which Allstate's adjusters could incorporate into their actual claim evaluations.[128] In other words, Allstate would predetermine the value of certain claims and then charge its adjusters with matching those values in their actual claim evaluations.[129] In determining the preset values, Allstate used figures that aligned with its profit goals rather than using evaluations from independent, real world professionals. Rather than using real and current market values in its "tuning" of Colossus, Allstate entered its own figures and used those evaluations to set a "new and reduced market value for claims."[130] Allstate used Colossus in its CCPR evaluation of bodily injury claims. It is the market's role – not Allstate's role - to set market values for claims, and Allstate committed bad faith in

[125] *See* Berardinelli, at 708 (citing "The McKinsey Slides," at 9721).
[126] *See* Berardinelli, at 257 (citing "The McKinsey Slides" at 710).
[127] *See* Berardinelli, at 262, 323, 361 (citing "The McKinsey Slides" at 934, 3548, 5226).
[128] *See* Berardinelli, at 606 (citing "The McKinsey Slides" at 11545).
[129] *See* Berardinelli, at 359 (citing "The McKinsey Slides" at 5182).
[130] *See* Berardinelli, at 281, 606 (citing "The McKinsey Slides" at 1577, 11545).

attempting to artificially set claim market values and apply those values to plaintiff's claim.

57.    The McKinsey slides are the construction plans for Allstate's "claim payment factory."  They show how McKinsey designed Allstate's claim handling system to underpay homeowner and other insurance claims.  They show how McKinsey designed Allstate's claim factory to produce an inherently defective product that fails to provide insureds with prompt and fair indemnification for their covered losses, thereby endangering our standard of living.  Allstate evaluated the plaintiff's claim using this system and denied the plaintiff's claim for reasons unrelated to the merits of the claim.

58.    Allstate knew that its implementation of CCPR would create a significant risk of liability for bad faith claims and punitive damages.[131]  Nevertheless, Allstate analyzed CCPR for "balance of risk and reward" and concluded that CCPR's rewards would justify any risk.[132]  In other words, even if Courts and juries imposed bad faith penalties on the minimal amount of cases that proceeded to trial, CCPR would still produce the intended profits because plaintiffs' lawyers would overall be reluctant to litigate and take enough cases to trial.  Remember, Allstate devoted a substantial portion of CCPR to sending a message to plaintiffs' attorneys regarding "attorney economics" and the fact that Allstate would vigorously defend claims without regard to the merits of those claims.[133]

---

[131] *See* Berardinelli, at 90 (citing "The McKinsey Slides" at 1686).
[132] *Id.*
[133] TH *See* Berardinelli, at 693 (citing "The McKinsey Slides" at 5379); *Young v. Allstate*, 119 Haw. at 407.

59. The goals, processes, and procedures of the CCPR program have been absorbed into Allstate's overall way of doing business. While Allstate might no longer use the CCPR terminology, the concepts, and teachings of CCPR in using the claims handling department as a profit center remain in effect. Allstate never stopped using CCPR in its handling of insurance claims. Allstate never hired McKinsey or another consulting firm to take on the monumental task of teaching a different claims handling system to its employees, instilling a new claim handling culture, or ensuring the elimination of CCPR from Allstate's claim handling culture, goals, and procedures. The goals, processes, and procedures left over from the CCPR program have been used to deny the plaintiff's claim in a deceptive, fraudulent, oppressive, and malicious manner. In the case at hand, Allstate employed its CCPR-based claim system in its handling of plaintiff's claim. In doing so, Allstate denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns. To date, Allstate continues to delay in the payment for the damages to the property. As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

### POST-CLAIM UNDERWRITING

60. Plaintiff alleges that Allstate engaged in fraudulent post-claim underwriting. At the time that defendant sold the insurance policy to plaintiff, defendant had no intention of performing its duties and honoring the representations it made to plaintiff. Specially, this representation consisted of defendant's promise to provide full indemnity to plaintiff

from financial loss caused by a covered peril, less the policy deductible. Allstate intentionally under-evaluated the risk associated with the insurance policy to secure the policy sale and made an attempt to properly evaluate the risk only after plaintiff filed the insurance claim at issue. In its use of post-claim underwriting, defendant searched for reasons to deny plaintiff's claim by conducting the type of evaluation that it should have conducted before defendant sold the policy to plaintiff and before plaintiff paid insurance premiums to defendant. Had plaintiff known and understood that defendant would engage in post-claim underwriting before plaintiff agreed to purchase the insurance policy from defendant, the plaintiff could have made an informed decision and purchased coverage from a different insurance company. Defendant's actions allowed defendant to collect an upfront premium profit while intending to betray its promise of full indemnity. In the case at hand, defendant's fraudulent post-claim underwriting scheme caused plaintiff to purchase a worthless insurance policy and suffer financial property loss.

61. Allstate denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns. To date, Allstate continues to delay in the payment for the damages to the property. As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

### COUNT 1 - BAD FAITH

62.  Plaintiff is insured under an insurance contract issued by Allstate, which gave rise to a duty of good faith and fair dealing.

63.  Defendant breached the duty by denying and delaying payment of a covered claim when defendant knew or should have known its liability under the policy was reasonably clear.

64.  Following its initial inspection, Allstate possessed all information necessary to enable it to make a fair coverage and payment determination on plaintiff's claim.   In addition, following its initial inspection, Allstate failed to provide coverage for all the covered damage, including the damage that plaintiff's inspector discovered during his inspection.  Although Allstate designed its claims investigation system in a manner that would ensure timely claim payments, reasonable property inspections, and thorough property inspections, Allstate failed to honor its obligation to perform a reasonable investigation and issue timely payment to plaintiff.

65.  Defendant's breach of duty proximately caused injury to plaintiff, which resulted in the following damages:

  a.  mental anguish damages; and

  b.  loss of policy benefits.

66.  <u>Exemplary damages.</u>  Plaintiff suffered injury independent of the loss of policy benefits, and that injury resulted from defendant's gross negligence, malice, or actual

fraud, which entitles plaintiff to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

## COUNT 2 - BREACH OF CONTRACT

67.    In addition to other counts, Allstate breached its contract with plaintiff.

68.    Plaintiff and defendant executed a valid and enforceable insurance contract.  The contract stated that defendant would pay the replacement cost of all damage which occurred to plaintiff's property caused by a covered peril, and that plaintiff would pay insurance premiums and perform other obligations as outlined in the insurance policy.

69.    Plaintiff fully performed plaintiff's contractual obligations.

70.    Allstate breached the contract by refusing to pay the full amount of the cost to repair or replace the property.  Allstate failed and refused to pay any of the proceeds of the policy, although due demand was made for proceeds to be paid in an amount sufficient to cover the damaged property and all conditions precedent to recovery upon the policy had been carried out and accomplished by plaintiff.

71.    Plaintiff seeks unliquidated damages within the jurisdictional limits of this court.

72.    <u>Attorney Fees.</u>  Plaintiff is entitled to recover reasonable attorney fees under Texas Civil Practice & Remedies Code chapter 38 because this suit is for breach of a written contract.  Plaintiff retained counsel, who presented plaintiff's claim to Allstate. Allstate did not tender the amount owed within 30 days of when the claim was presented.

73.     Defendant Allstate failed to explain to plaintiff the reasons for Allstate's offer of an inadequate settlement.    Allstate failed to offer plaintiff adequate compensation without adequate explanation of the basis in the policy for its decision to make less than full payment.   Furthermore, Allstate did not communicate that any future settlements or payments would be forthcoming to pay for the entire losses covered under the policy, nor did they provide any explanation for the failure to adequately settle plaintiff's claim.

74.     Allstate failed to affirm or deny coverage of plaintiff's claim within a reasonable time.   Specifically, plaintiff did not receive timely indication of acceptance or rejection, regarding the full and entire claim, in writing from Allstate.

75.     Allstate refused to fully compensate plaintiff under the terms of the policy, even though Allstate failed to conduct a reasonable investigation.   Allstate performed an outcome-oriented investigation of the plaintiff's claim which resulted in a biased, unfair, and inadequate evaluation of plaintiff's losses on the property.

76.     Allstate failed to meet its obligations under the Texas Insurance Code regarding its duties to timely acknowledge plaintiff's claim, begin an investigation of plaintiff's claim, and request all information reasonably necessary to investigate plaintiff's claim within the statutorily mandated time of receiving notice of plaintiff's claim.

77.     Allstate failed to accept or deny plaintiff's full and entire claim within the statutorily mandated time of receiving all necessary information.   In addition, Allstate

failed to communicate with plaintiff to ensure that plaintiff understood the coverage denials they received.

78.     Defendants' acts or practices violated:

a.      Texas Insurance Code chapter 541, subchapter B.

(1)     Misrepresenting to a claimant a material fact or policy provision relating to the coverage at issue. TEX. INS. CODE §541.060(a)(1).

(2)     Not attempting in good faith to bring about a prompt, fair, and equitable settlement of a claim once the insurer's liability becomes reasonably clear. TEX. INS. CODE §541.060(a)(2)(A).

(3)     Not promptly giving a policyholder a reasonable explanation, based on the policy as it relates to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim. TEX. INS. CODE §541.060(a)(3).

(4)     Not affirming or denying coverage within a reasonable time. TEX. INS. CODE §541.060(a)(4)(A).

(5)     Refusing to pay a claim without conducting a reasonable investigation. TEX. INS. CODE §541.060(a)(7).

(6)     Making an untrue statement of material fact. TEX. INS. CODE §541.061(1).

(7)     Leaving out a material fact, so that other statements are rendered

misleading.  TEX. INS. CODE §541.061(2).

b.     Texas Deceptive Trade Practices Act §17.46(b).

(1)     Representing that an agreement confers or involves rights, remedies, or obligations that it does not, or that are prohibited by law.  TEX. BUS. & COM. CODE §17.46(b)(12).

c.     Texas Insurance Code Chapter 541.151.

79.     Defendants' acts and practices were a producing cause of injury to plaintiff which resulted in the following damages:

a.     actual damages; and

b.     insurance policy proceeds.

80.     Plaintiff seeks damages within the jurisdictional limits of this Court.

81.     <u>Additional damages.</u>  Defendants acted knowingly, which entitles plaintiff to recover treble damages under Texas Insurance Code section 541.152(b).

82.     <u>Attorney fees.</u>  Plaintiff is entitled to recover reasonable and necessary attorney fees under Texas Insurance Code section 541.152(a)(1).

### COUNT 4 - LATE PAYMENT OF CLAIMS

83.     Plaintiff is insured under a contract for homeowner's insurance issued by defendant.

84.     Defendant Allstate is a corporation.

85. Plaintiff suffered a loss covered by the policy and gave proper notice to Allstate of plaintiff's claim.

86. Allstate is liable for the claim and had a duty to pay the claim in a timely manner.

87. Defendant breached its duty to pay plaintiff's claim in a timely manner by not timely:

    a.   acknowledging the claim;

    b.   investigating the claim;

    c.   requesting information about the claim;

    d.   paying the claim after wrongfully rejecting it; and

    e.   paying the claim after accepting it.

88. Allstate's breach of duty caused injury to plaintiff, which resulted in the following damages:

    a.   mental anguish damages;

    b.   policy proceeds;

    c.   prejudgment interest

89. <u>Statutory damages.</u> Plaintiff is entitled to recover actual damages in the amount of the claim, and under Texas Insurance Code section 542.060(a), statutory damages of 18% of the amount of the claim.

90. <u>Attorney fees.</u> Plaintiff is entitled to recover reasonable attorney fees under Texas Insurance Code section 542.060(b).

91.    Underwriting is not only a part of insurance; underwriting *is* insurance.[134] Underwriting is the function of securing and evaluating information and making decisions to accept or reject risks.[135]  The insurance underwriting and claims processes are inextricably linked.  When a loss occurs, the policyholder's payment of that loss has already been collected during the underwriting process.[136]  Insurance can work effectively only if underwriters accept risks that will experience no more than the types and amounts of losses anticipated in rates.[137]  If the underwriters accept risks that experience more losses than anticipated, the rates will be inadequate, and the insurer's solvency might be threatened.[138]

92.    Before an insurer sells an insurance policy to a customer, the insurance company underwrites the property to be insured.  When an insurer underwrites a new policy, it records a premium receivable (which is an asset) and a claim obligation (which is a liability).[139]  Hence, the claim handling process begins when the insurance company sells the insurance policy to the insured – not when the anticipated loss occurs.[140]  The liability

---

[134] Robert B. Holtom, CPCU, *Underwriting Principles & Practices,* at p. 3 (3rd ed. National Underwriter 1987), hereinafter referred to as "Holtom."

[135] *Id*. at 11.

[136] Feinman, Jay M., *Delay, Deny, Defend: Why Insurance Companies Don't Pay Claims and What You Can Do About It*, at 28 (1st ed. Penguin Group 2010), hereinafter referred to as "Feinman."

[137] Hoopes, Doris, *The Claims Environment*, at 1.13 (American Institute for Chartered Property Casualty Underwriters, 2nd ed. 2006), hereinafter referred to as "Hoopes."

[138] *Id*.

[139] https://www.investopedia.com/terms/l/loss-reserve.asp

[140] *Id*.

is considered part of the unpaid losses account, which represents the loss reserve.[141] Maintaining an adequate level of loss reserves puts an insurance company in a better financial position to pay out claims.[142]

93.    Thus, the insurer reserves money to pay a claim in advance of the claim occurrence and during the policy underwriting process.  Specifically, in calculating the premium, the insurance company performs a set of calculations.  First, the insurance company determines the "loss costs."[143], which make up the primary block of the insurance premium.  Loss costs are the insurer's good faith projection of how much it will pay for claims that arise under the policy during a given policy period.  Loss costs are based on vast actuarial experience and are usually very accurate, being based on the "law of large numbers."[144]  Generally, loss costs make up generally about seventy cents ($0.70) of every premium dollar an insured pays for property-casualty coverages.[145]

94.    To correctly underwrite any risk and thus properly calculate the loss costs, the insurance company underwriters must secure information about the risk.[146]  Every discussion about the underwriting decision to be made on an insurance application must

---

[141] *Id.*
[142] *Id.*
[143] Also called "loss trends."  Rubin, Harvey W., DICTIONARY OF INSURANCE TERMS, at 278 (3rd ed. Barron's 1995).
[144] "In a statistical context, 'law of large numbers' implies that the average of a random sample from a large population is likely to be close to the mean of the whole population."  *See* Wikipedia Encyclopedia, http://en.wikipedia.org/wiki/Law_of_large_numbers.
[145] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.
[146] Holtom, at 57.

be based on facts that have been secured.[147] One of the major reasons for securing

information about each risk concerns the insurance company's avoidance of adverse

selection in underwriting a policy.[148]  Adverse selection refers to situations in which an

insurance company extends coverage to an applicant whose actual risk is substantially

higher than the risk known by the insurance company.[149]  To minimize the risk of adverse

selection, the insurance company must obtain information regarding the physical

condition of the buildings it contemplates insuring.[150]  Thus, property inspections are

critical in the underwriting workflow.  These inspections are often used to verify the

insured not only exists at the address on the policy and there are no liability or other

hazards that exist on the property that could cause the property owner and/or the

insurance company unnecessary exposure.[151]   These inspections are used as an

underwriting tool to minimize the potential of an insurance claim and to verify that the

information collected at the time of application for the policy is correct.[152]  Allstate failed

to conduct an underwriting inspection and failed to property underwrite the insurance

policy.

95.  Allstate could not provide its insurance services unless it was able to make a

legitimate profit sufficient to allow it to remain solvent and provide a reasonable return

---

[147] *Id.*
[148] *Id.* at 58.
[149] *Id.*
[150] *Id.* at 59.
[151] Wickert, Gary. "Insurer's Liability for Negligent Inspections." *Self-Funding Magazine*, Mar. 2013, pp. 17-21.
[152] Holtom, at 57-58.

to its shareholders.[153]   The premium that Allstate required plaintiff to pay for the insurance policy was calculated to allow Allstate to accomplish those goals.

96.   Allstate charges its policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period.[154]  Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar, with the remaining five cents ($0.05) being allocated for Allstate's profit.[155]  In addition, Allstate's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are collected and when the claims are finally paid (on average about ten cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.[156]

97.   Allstate made the material representation to plaintiff that Allstate would pay the full cost of casualty losses, less the policy deductible, that plaintiff suffered in a covered event.  This representation was false.  When Allstate made this representation, Allstate knew that Allstate had not underwritten the policy correctly.  The McKinsey program dictated that Allstate focus on marketing, collecting premiums, and building a litigation program to vigorously fight policyholders who attempted to challenge Allstate's claim

---

[153] *See* Berardinelli, at 36.
[154] *See* Transcript of Trial Testimony of Alan Hapke, at 26-28, June 29, 1995, *King et al. v. Providence Washington Ins. Co., et al.*, SF 91-141(C).  Alan Hapke is a property casualty actuary, Fellow of the American Academy of Actuaries and Casualty Actuary Society, and the former head actuary for Sentry Insurance Group.
[155] *See* Berardinelli, at 19.
[156] *Id.*

decisions. Allstate did not underwrite the policy with the intent of paying the full value of future claims. Just the opposite – Allstate underwrote the policy knowing that the McKinsey claim handling system would enable it to enforce its predetermined claim values without regard to the true value of a policyholder claim. In other words, because Allstate's McKinsey program predetermined policyholder claim values, it was unnecessary for Allstate's actuaries to predict the value of future claims through the underwriting process.

98.    When Allstate sold plaintiff the insurance policy, Allstate promised to pay the full value of future covered claims. Allstate knew that it had no intention of paying the full value of policyholder claims, and that Allstate would only pay the predetermined claim value calculated via the McKinsey method without regard to the actual value of the sustained loss. Allstate knew that, if plaintiff challenged the claim decision, Allstate would implement its litigation plan to force plaintiff to accept Allstate's predetermined claim value. Allstate made this representation with the intent that the plaintiff act on it. Allstate knew that the plaintiff was seeking peace of mind, and Allstate made the representation knowing that plaintiff would act on it. The plaintiff purchased the policy, paid all premiums, in reliance on the representation and with the expectation that Allstate would keep its promise. The representation caused injury to plaintiff.

99.    The McKinsey program dictated that Allstate give plaintiff a choice: Accept a settlement now for a fraction of the true cost of plaintiff's damage or expect to spend

several years in grueling litigation. McKinsey predicted that ninety percent (90%) of claimants would be forced to capitulate because the claimants would need the money in a prompt settlement.[157] The plaintiff gave Allstate money for something that the plaintiff could never receive. Allstate sold uncollectible insurance to the plaintiff. With one hand, Allstate sold the plaintiff an insurance policy and promised to protect the plaintiff from financial harm. With the other hand, Allstate used the McKinsey program as a hammer to destroy the protection that Allstate promised to provide.

100. Allstate lied when it informed plaintiff that the policy did not cover all of plaintiff's damages. Allstate's motivation in telling this lie was to properly execute the McKinsey strategy and thus allocate the entire policy premium to profit. Allstate told this lie to further the original fraud – the selling of an insurance policy to plaintiff that Allstate knew would not function as promised.

101. Allstate's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

      a.    actual damages;

      b.    exemplary damages; and

      c.    prejudgment interest.

---

[157] *See* Berardinelli, at 687 (citing "The McKinsey Slides" at 3372).

## Count 6 – Fraud by Nondisclosure

102.  Plaintiff incorporates into this count the allegations contained in paragraphs 90 through 99.  The CCPR program would govern any claim filed by plaintiff under the policy.  As previously described, the purpose of the CCPR program was to increase corporate profits at plaintiff's expense should plaintiff ever file a claim under the policy.  Allstate concealed this fact from plaintiff and failed to disclose the facts about the CCPR program to plaintiff.  Because the operation of the CCPR program directly contradicted the promises that Allstate made to the plaintiff, Allstate had a duty to disclose these material facts to plaintiff.  The defendant knew the plaintiff was ignorant of the facts and that the plaintiff did not have an equal opportunity to discover the facts.  Allstate was deliberately silent when it had a duty to speak.  By failing to disclose the facts, the defendant intended to induce the plaintiff to purchase the insurance policy.  Plaintiff purchased the policy and thus relied on Allstate's nondisclosure.  Plaintiff was injured when plaintiff acted without the knowledge of the undisclosed facts.

103.  Allstate never intended to pay claims under the plaintiff's policy.  Allstate's plan all along was simply to collect premiums, allocate the premiums to profit, and use its staunch litigation strategy to discourage plaintiff, other claimants, and their attorneys from challenging Allstate's claim decision.

104. Allstate's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

a.   actual damages;

b.   exemplary damages; and

c.   prejudgment interest.

### THE WHO, WHAT, WHEN, AND WHERE

23.   In support of the elements of common law fraud and fraudulent nondisclosure, plaintiff

alleges the following:

a.   **THE WHO:**   Allstate Texas Lloyds Underwriters who underwrote plaintiff's policy.

b.   **THE WHAT:**   First misrepresentation – Allstate would pay covered losses when it sold the insurance policy to plaintiff.

Second Misrepresentation – In furtherance of the fraud, Allstate misrepresented to plaintiff that plaintiff's damages were not covered by the policy on August 24, 2020.

c.   **THE WHEN:**   First Misrepresentation – The date on which Allstate sold the policy covering the date of loss to plaintiff.

Second Misrepresentation – August 24, 2020.

d.   **THE WHERE:**   Mission, Texas

### JURY DEMAND

105.   Plaintiff respectfully requests a trial by jury.

### CONDITIONS PRECEDENT

106.   All conditions precedent to plaintiff's claim for relief have been performed or

have occurred.

**PRAYER**

107. For these reasons, plaintiff asks that plaintiff be awarded a judgment against defendant for the following:

a.   Actual damages.

b.   Prejudgment and postjudgment interest.

c.   Consequential damages.

d.   Court costs.

e.   Attorneys' fees.

f.   Exemplary damages.

g.   All other relief to which plaintiff is entitled.

Respectfully submitted,

SCOTT LAW OFFICES, P.C.
The Great Jones Building
708 Main Street
Houston, Texas 77002
Telephone: (713) 941-9309
Facsimile: (844) 270-0740


*/s/Danny Ray Scott*
_____
Danny Ray Scott
State Bar No. 24010920
casenotifications@scottlawyers.com

*Attorney for Plaintiff*